[Civil No. 4511.    Filed June 1, 1942.]

[126 Pac. (2d) 303.]

STATE OF ARIZONA ex rel. JOE CONWAY, Attorney General, Plaintiff, v. JOE HUNT, State Treasurer, Defendant.

Mr. Joe Conway, Attorney General, and Mr. W. E. Polley, Assistant Attorney General, for Plaintiff.

Mr. Joe Conway, Attorney General, and Mr. Edward P. Cline, Assistant Attorney General, for Defendant.

ROSS, J.—Whether the writ of *mandamus* should issue against the state treasurer, Joe Hunt, depends upon the construction of certain provisions of Chapter 44, Laws of 1941, Regular Session, relating to the state hospital and providing for its administration. Sections 6 and 17 thereof read as follows:

"Sec. 6. *Payment Of Maintenance*. In the event a person is received by the state hospital whose estate is chargeable with his maintenance, the court shall fix the amount to be charged and shall collect and receive all moneys due therefor. Moneys so collected and moneys collected for the care of voluntary patients shall be paid to the state treasurer, through the state auditor, and credited to the fund for operation and maintenance of the state hospital."

"Sec. 17.  Section 8–303, Arizona Code of 1939 (sec. 1771, Revised Code of 1928), is amended to read:

"8–303. *Cost Of Maintenance; Guardian Of Property.* The superior court shall cause inquiry to be made into the ability of any insane person committed by it, to bear the charges and expenses of his examination, commitment and maintenance while in custody, and if the insane person is able by the possession of money or property, to pay such charges or any portion of them, such court shall fix the amount thereof, and appoint a guardian of the property of such person, as in other cases of guardianship. The guardian shall pay the cost of the examination, and the expenses of commitment and maintenance of said insane person, from the estate of said insane person, and all such costs and expenses shall be paid by the guardian to the state treasurer, through the state auditor, and credited to the fund for operation and maintenance of the state hospital. . . . "

Some time after said Chapter 44 became effective, the state auditor paid to the defendant state treasurer $14,070.91, and of this sum the treasurer credited $8,639.91 to the fund for operation and maintenance of the state hospital, and the balance of $5,431 to the general fund of the state.

It appears from defendant's return to the writ to show cause that the latter sum consists of funds paid to the state hospital by the Government of the United States for the care and maintenance of its Indian wards committed to it, and moneys paid to said hospital on account by relatives and friends of the persons committed to such institution by a court of competent jurisdiction, and that no part of said sum is made up of moneys paid by voluntary patients or moneys coming out of the estates of persons who are or were inmates of the said hospital.

The pleadings disclose that the Attorney General of the state is acting in the dual capacity of attorney for both the plaintiff and defendant. As attorney for

plaintiff he makes the contention that said sum of $5,431 belongs to the fund for operation and maintenance of the state hospital, and as attorney for the defendant he contends it belongs to the state's general fund. We think, however, the Attorney General is not in disagreement with himself as to the facts, which are clearly stated in defendant's return to the writ.

Under section 6, *supra,* the money collected for two kinds of patients is to be credited to the fund for operation and maintenance of the state hospital, that is, a patient ''whose estate is chargeable with his maintenance'' and ''voluntary patients'' that may be admitted to the hospital as provided in section 7 of said chapter. Section 17, *supra,* makes it the duty of the court committing a person to such institution to determine whether he ''is able by the possession of money or property'' to bear the charges and expenses of his examination, commitment and maintenance and, if so, to fix the amount thereof; to appoint a guardian of the property, with the duty to pay the costs of his examination, the expenses of commitment and maintenance from his estate, which sums are to be paid by such guardian to the state treasurer, through the state auditor, and credited to the fund for the operation and maintenance of the state hospital.

We think it implicit in the legislation concerning insane persons, as found in sections 8–301 to 8–303 and 47–217, Arizona Code 1939, that such persons should be cared for regardless of whether they have means to pay for their care or not. That is true also of Chapter 44, *supra.* The legislative intent, as gathered from these acts, is that an insane person, if he have property, should bear the expense incident to his commitment to the hospital and for his maintenance thereafter.

However, sections 6 and 7, *supra,* make no provision for the disposition of moneys received by the

hospital for the care and maintenance of the Government's Indian wards, or money paid by friends and relatives of inmates.

Nor is the court committing persons to the hospital required to make any order concerning the expenses of insane indigent persons or persons without money or property out of which their maintenance might be paid.

In the general appropriation bill for the biennium 1941–1942, 1942–1943, being Chapter 122, Laws of 1941, Regular Session, the legislature, in subdivision 11, section 1, provides for the maintenance of the hospital and appends thereto this sentence:

" . . . There is also appropriated to the state hospital for the insane, to be available for operation, all revenue received for the care of voluntary patients or patients whose maintenance is declared by the committing court to be a charge against the estate of the patient."

This language does not cover money received from the Government for the care of its Indian wards, nor from friends and relatives paid on account for the care of inmates of the hospital. In other words, while the hospital has received such sums and doubtless had the right to accept such payments, the legislature has failed, by the provisions of sections 6 and 17, *supra,* and of subdivision 11, section 1, of Chapter 122, *supra,* to provide what shall be done with such revenues.

We look, then, to the general provisions of the financial code. Section 10–204 thereof provides:

" . . . The gross amount of all other state moneys received by any agency of the state or its political subdivisions, or any officer or person, from whatsoever source, shall be paid into the state treasury to the credit of the general fund, on or before the first day of each month after receipt of same, without any deductions whatsoever. . . . All moneys received from the federal government, unless otherwise expressed by it, shall

be credited upon receipt by the state treasurer to the account of the proper state agency in the general fund.''

We think this language is the ''grab bag'' into which these funds should go. In other words, such revenues or funds should be credited to the state's general fund. We observe that in this instance the federal government was paying a debt it owed to the state, just like any other debtor. It was not a fifty-fifty proposition such as the public road fund, nor was it a contribution for social welfare or vocational education or something of that kind, in which case it should be credited to such agencies.

It is probable, we think, the legislature would have employed language broad enough to include as part of the state hospital fund the items making up the $5,431 had its attention been called to the fact that such moneys had been or were being paid by the Government for its Indian wards, or paid by friends or relatives on account of persons committed to such institution. We cannot supply the omitted language for that would amount to legislation by the court.

We have disposed of the matter as presented, since all the facts are set out, but the question is one in which officers of the state apparently differ as to the correct interpretation of a statute and we think it is an ideal one for a declaratory judgment, and in such an action the Attorney General could act without appearing for both the plaintiff and defendant. *State ex rel. Frohmiller* v. *Hendrix et al.,* 124 Pac. (2d) 768, decided by this court April 20, 1942.

We conclude that the state treasurer properly placed the $5,431 to the credit of the state's general fund and that the alternative writ of *mandamus* should therefore be quashed. It is so ordered.

LOCKWOOD, C. J., and McALISTER, J., concur.